[Cite as *In re M.K.*, 2023-Ohio-96.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| IN THE MATTER OF: | : | JUDGES: |
| | : | Hon. Earle E. Wise, P.J. |
| M.K. | : | Hon. W. Scott Gwin, J. |
| | : | Hon. Craig R. Baldwin, J. |
| A.K. | : | |
| | : | |
| E.K. | : | Case Nos. 22CA000030 |
| | : | 22CA000031 |
| | : | 22CA000032 |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Guernsey County
Court of Common Pleas, Juvenile
Division, Case No. 20JC00255

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      January 12, 2023

APPEARANCES:

For Plaintiff-Appellant A.P.      For Defendant-Appellee GCCS

ANDREW E. RUSS      MELISSA WILSON
P.O. Box 520      1009 Steubenville Ave.
Pickerington, Ohio 43147      Cambridge, Ohio 43725

For Guardian Ad Litem      For CASA/GAL

RICHARD D. HIXSON      CHERYL GADD
3808 James Court, Suite 2      801 Wheeling Avenue
Zanesville, Ohio 43701      Cambridge, Ohio 43725

*Baldwin, J.*

{¶1}  Mother, A.P., appeals the decision of the Guernsey County Common Pleas Court, Juvenile Division, granting appellee Guernsey County Children's Service's motion for permanent custody of her three children, M.K., E.K., and A.K.

**STATEMENT OF THE FACTS AND THE CASE**

{¶2}  Guernsey County Children's Services, (GCCS) began providing services to A.P. and her family in October 2018 after receiving allegations of child neglect and abuse. The family received assistance from the children's school, an organization called Creative Options, the Board of Developmental Disabilities and GCCS.

{¶3}  Jenny Antill of the Guernsey County Board of Developmental Disabilities began working with the family in May 2019 assisting with their son, M.K.'s, behaviors and developing a plan to identify his needs and strengths. She observed that M.K. repeatedly attempted to run away, used extreme vulgar/sexualized language, was physically aggressive, acted out and destroyed property. At school he would attack people and other students, would attempt to bite them and acted out sexually. Though her focus was M.K., she was concerned about the behavior of A.P.'s daughter, E.K. E.K. stripped naked and ran around the house. She ripped the couch cushions and tried to eat the padding from inside the cushions. E.K. was so disruptive that Antill took a colleague to a visit to deflect E.K.'s physical attempts to intervene in her meeting with M.K.

{¶4}  A.P. and the father of the children, W.K., disclosed to Antill that they were not confident they could parent M.K. and deal with his behaviors. Antill arranged for services to come to the home and assist with M.K. and while W.K. and A.P. would accept recommendations, they did not consistently apply the information provided. Antill recalled

that "[w]e would make a suggestion and they would do it maybe for a week and then it just kind of fell off the charts." (Trial Transcript, p. 43, lines 4-6).

{¶5} During one visit, Mother mentioned to Antill that A.K. suffered seizures and Antill explained that A.K. may qualify for services if Mother would obtain a written diagnosis regarding the seizures, but Mother never provided the diagnosis.

{¶6} W.K. and A.P. executed a voluntary agreement of care with GCCS in July 2020, and the agreement was renewed twice. (Juv.R. 38(A)(1)). Despite the services provided, the parents were unsuccessful in caring for the children. GCCS obtained an ex parte order on October 1, 2020 granting GCCS temporary custody. The trial court found the children dependent (Journal Entry, Dec. 15, 2020) and at the dispositional hearing ordered that they remain in the temporary custody of GCCS and approved the case plans for the parents. (Journal Entry, Jan. 11, 2021).

{¶7} The case plan included a requirement that A.P. complete a drug and alcohol assessment at the provider of her choice and follow any recommendations provided, participate in random drug screens, complete a mental health assessment and follow any recommendations. She was asked to attend a parenting class that specializes in dealing with challenging behaviors to assist her with parenting her three children and she was obligated to demonstrate that she could provide a safe and stable home for the children. She was also asked to demonstrate that she could provide for the children's basic needs including nutrition, shelter, clothing, bedding, supervision, medical and educational needs.

{¶8} GCCS moved for permanent custody on September 15, 2021, but requested that motion be dismissed without prejudice in February 2022. A second motion

for permanent custody was filed on February 25, 2022 and amended March 1, 2022. GCCS contended that the parents had failed to remedy the issues that resulted in the children being removed from the home despite receiving services from a number of different agencies during the voluntary agreement of care and during the time the children were in temporary custody of GCCS. The motion also described each child's mental health status and their placement in residential treatment.

{¶9} GCCS offered testimony regarding the diagnoses of each child as well at their behavioral issues at the hearing on the motion for permanent custody.

**The Children's Status**

{¶10} GCCS discovered that each child suffered serious mental health diagnoses and their behaviors made placement with foster parents untenable. They were first placed into a foster home as a group, but it soon became evident that M.K.'s behavior with his sister's required a separate placement. He was not only physically abusive to his foster parents, he was also acting-out sexually with his sisters, and frequently engaged in "humping" his sisters, an action imitating sexual intercourse. M.K.'s behaviors lead to an institutional placement where he was closely monitored and where he has had more success in controlling his inappropriate behavior.

{¶11} The two girls, E.K. and A.K., were initially kept together, but their behaviors overwhelmed the ability of foster parents to provide care and supervision and they were separately placed in residential facilities that had the resources to manage their behavior and provide therapy.

**M.K.**

**{¶12}** Danielle Oddo, M.K.'s therapist, described his initial diagnosis as ADHD, oppositional defiant disorder, and unspecified mood disorder. He committed repeated sexually vulgar behaviors that led to his being restrained once or twice every day. He has made improvement, but this eleven-year-old is still in a sexual aggressor's therapy group, aggressive replacement training group, and individual therapy and is taking three medications to address his behaviors.

**{¶13}** When M.K. is prepared to leave his current residential placement, Oddo recommended "a therapy to foster home, preferably one that's foster to adopt. Somebody that -- ideally a two-parent home that has experience with children transitioning out of residential services. If not, someone willing to work with us in therapy to allow the transition to be smooth." (Trial Transcript, p. 75, lines 1-6). She expected M.K. to need therapy for a period of time and an environment with a consistent schedule and regimen.

### E.K.

**{¶14}** M.K.'s sister, E.K., had mental health issues as well and was treated by Kristina Morgan beginning on June 13, 2022. E.K. came to Morgan with a diagnosis of post-traumatic disorder, attention-deficit/hyperactivity disorder, adjustment disorder, and disruptive mood dysregulation disorder. This seven-year-old girl receives two-and-a-half hours of mental health, day-treatment group each day and individual therapy twice a week. She meets with a psychiatric nurse practitioner at least once a month. She receives daily nursing services, and community supportive psychiatric treatment and is taking two medications.

**{¶15}** E.K. has made improvement, but it is limited. She too was transferred to a residential facility after unsuccessful placements in foster homes. Initially she was striking

staff or peers every two hours, but now she can control her assaults for one-half of the day before she lashes out. She is now taking her medication instead of refusing them or spitting them out. Once she has sufficiently improved and can be released from residential placement, she would need one-on-one care, structure and firm boundaries and further individual, family and group counseling.

**A.K.**

{¶16} A.K., now ten years old, has also suffered significant problems. Her therapist, Jacqueline Witzberger, noted that she had poor attention span, difficulty staying on task, significant sleep issues and significant anxiety initially, then began exhibiting significant sexual acting-out behaviors and sexualized behaviors prior to the hearing on permanent custody. She had urinated on herself and in hallways. She defecated in the hallways and had eaten her own feces. She is stripping clothing off and engaging in sexual acts or mimicking sexual acts with other children.

{¶17} A.K. was diagnosed with ADHD, unspecified type, post-traumatic stress disorder, simple febrile convulsion and behavioral insomnia of childhood, sleep onset, association type.

{¶18} A.K. has an Individualized Education Plan and receives speech therapy. She participates in CSPT (Community Supportive Psychiatric Treatment) groups that assist her with life skills and social development seven days a week. She participates in recreational therapy groups seven days a week and attends a psychotherapy group provided by a licensed professional counselor five days a week. She receives individual therapy at least twice a week and she sees a psychologist twice every month. At the time

of the hearing she had been prescribed five medications to address mental health issues and her inability to sleep.

{¶19} A.K.'s progress has stalled as she deals with stages of grief and she is currently exhibiting anger at people in her family and "at where her life is now." Her therapist felt this was a typical occurrence in residential placement since "[r]esidentials are facilities for the children who have had the most traumatic, darkest early childhood experiences. They can't function in the community safely. And so, they come in with a host of difficulties and struggles and issues. And they go through periods of time where you see them play out those behaviors, those situations, those events in their life." (Trial Transcript, p. 89, lines 17-24).

{¶20} Once A.K. is able to leave her residential placement, her therapist recommended intensive home-based services so that she has people that are in the home providing support to the family and to her, so she feels safe. A.K. will require continued psychiatric care for medication management and specialized education services.

{¶21} Each child has extensive needs that require the attention of several professionals and each is under constant close supervision. Each is progressing as expected in their separate residential placement, and the record shows that placement of the children together would not be safe and would interrupt their progress toward recovery.

**MOTHER'S PROGRESS**

**{¶22}** Mother completed a mental health assessment with Dr. Aimee Thomas on July 8, 2020, prior to the children being taken into custody, and she diagnosed Mother as suffering from Schizoaffective Disorder, Borderline Personality Disorder, Borderline Intellectual Ability, Alcohol Use Disorder, Severe, Cannabis Use Disorder, Severe, Stimulant Use Disorder, Severe. Dr. Thomas concluded that "This family requires intensive intervention. However, even with the support of intensive services, their prognoses is poor given the severity of [A.P.'s] mental health diagnoses, her ongoing use of alcohol, and her children's special needs" and she questioned "the safety and wellbeing of [M.K., A.K. and E.K.] in the [parent's] home." (Thomas Deposition, Exhibit GCCS 2, p. 13, 15).

**{¶23}** Dr. Thomas conducted a second assessment on May 17, 2022 and May 29, 2022 during which she found that Mother "is essentially functioning at the level of a 14-year-old with regards to verbal skills and at the level of a 7-year-old with regards to problem-solving or analytical skills." (Thomas Deposition, Exhibit GCCS 3, p. 13). She found that Mother's "prior evaluation and current disclosures reveal ongoing symptoms that preclude her from addressing her children's special needs at present" and that her "non-verbal IQ of 72 reflects significant problems with problem solving, cause and effect thinking, and the ability to learn, internalize and apply information taught in mental health/substance abuse counseling and parenting skill training." (Thomas Deposition, Exhibit GCCS 3, p. 13, 16).

**{¶24}** Dr. Thomas updated her diagnoses at the second evaluation to: Schizoaffective Disorder (based on prior evaluation), Other Specified Personality Disorder - borderline traits, childlike, poor insight, Borderline Intellectual Ability, Alcohol

Use Disorder, Severe, in remission, Cannabis Use Disorder, Severe, Stimulant Use Disorder, Severe, in remission.

**{¶25}** A.P. completed a parenting class, but when asked about her performance, the coordinator of the group offered only that she attended and participated, and did not comment on the quality of her involvement or any improvement in her abilities.

**{¶26}** A.P.'s case manager at Cedar Ridge explained that she was first evaluated on August 10, 2021 and began receiving case management, maternal health services, individual therapy, psychiatric and nursing services. Neither her case manager not any other witness offered testimony regarding the status of her therapy or what progress she made during the time between her evaluation and the hearing.

**{¶27}** A.P. did conceive two children while her children were in the custody of GCCS. The first was a child of W.K., the father of her other children. The second was conceived with a third man that she accompanied to Florida. She revealed to the Court Appointed Special Advocate that some months prior to the hearing she was in Florida with this man, they argued and he struck her. She made her way back to Ohio and discovered she was pregnant. Both children were lost to miscarriages.

**{¶28}** Also, during her first assessment with Dr. Thomas, in July 2020, A.P. described her relationship with W.K. as toxic and that "we fight, argue and cannot get along" clashing most frequently about parenting approaches. Despite the conflict, A.P. believed that W.K. was supportive of her plan to undergo gender reassignment. She claimed that she felt like a misfit in her own body, planned to go by the name of Angel after transition and she believed that W.K. supported her decision. She abandoned these

plans and reported to Dr. Thomas that she was no longer pursuing a gender change during her second assessment in May 2022.

**{¶29}** GCCS acknowledged that Mother was cooperative and completed goals in the case plan, but contended that she was not prepared to assume responsibility for the children. The guardian ad litem and the Court Appointed Special Advocate for the children agreed that the parents were not capable of parenting the children.

**{¶30}** The guardian ad litem recommended that the children be placed in the permanent custody of the GCCS, focusing on the serious behavioral issues suffered by the children and the parents' apparent difficulty in applying rudimentary parenting techniques as a result of their own mental health issues. He noted that the behaviors of each child were challenging the skills of persons trained to counsel and treat troubled children and that the children were in facilities that provided constant supervision. The parents were struggling with their own mental health and could not provide the guidance and support that one child needed and would be overwhelmed by the task of caring for all three.

**{¶31}** The guardian ad litem also expressed concern that if the children were returned to the parents, the children's sexualized behaviors would not be controlled. He reported that Mother overestimated her ability to care for the children and placing them together would not be safe for the children and would exceed her ability to care for them.

**{¶32}** The Court Appointed Special Advocate (CASA) for the children came to the same conclusion. She recommended that the court grant permanent custody to GCCS because:

* * each child is in treatment, residential treatment, their case plans all three outline trauma therapy due to posttraumatic stress. They have displayed sexualized behaviors. And they even -- in the beginning of this case the agency tried to put the girls together but had to split them up because of their sexualized behaviors and acting out. So to protect the children, they had to be split, the girls did. And they're each on medication that has to be given accordingly as ordered, not missed. By testimony we heard yesterday, that even the father had to be taken off his medication because he would forget to take his meds. And these children must have their medication on time. It is part of their treatment regime.

Trial Transcript, p. 348, line 13 to p. 349, line 3

{¶33} She concluded that Mother lacked the ability to parent these high needs children due to her cognitive ability, her lack of insight into each child's medical diagnosis, mental health issues, and the children's need for medication, structure and consistency. She noted that the children need a structured environment that the parents cannot provide:

In part, Mother, her heart's in the right place, but I don't believe she has the insight into what these needs are for her children. In her own words, she said, they just need love, I need to be kind, I need to pick my battles. Every day would be a battle. She forgets. And these children had issues when they came into care. [M.K.'s] doing better, but he's a long way to go. [E.K.] is just starting residential treatment and starting to cooperate a little bit. She still has good days, bad days. And [A.K.] is a child in crisis.

Trial Transcript, p. 349, lines 13-24

**{¶34}** She confirmed that neither parent appreciated the severity of the children's behaviors, and that, even with additional time, the children could not be reunited with their parents because once they complete residential treatment, they will need a therapeutic foster home to continue to address their needs. And she discounted the complaint that visitation had been stopped by observing that the children improved when visitation ended. M.K. still had phone contact, but it was brief and was usually ended by him.

**{¶35}** The CASA was also concerned by Mother's use of medical marijuana to self-medicate and feared it would impact her ability to parent. Mother was legally using medical marijuana under the supervision of a physician, but neither the physician nor any other expert testified as to its purpose. Mother asserted that the medical marijuana helped relieve the "blackouts" she claimed to have experienced, where her vision was interrupted for a period of time. She explained that they were not true blackouts, but acknowledged that her vision was affected and mentioned that an unidentified hospital recommended that she "get to neurology for it" but she had not seen a neurologist prior to the hearing. Aimee Thomas, a licensed psychologist who evaluated A.P. on June 22, 2022, affirmed the need for a neurological consult to resolve this issue.

**{¶36}** The trial court took the matter under advisement and issued a journal entry on August 24, 2022 granting the motion for permanent custody. After a thorough analysis of the testimony and evidence, the trial court concluded that:

> The Court finds that these children have been subjected to much trauma, neglect and abuse in their young lives. Father denies all wrong doing and mother has remained silent about this issue from the start. On

the one hand, the parents admit they have problems addressing their children's behaviors. On the other hand, they don't accept responsibility for much of the trauma. Mother and Father have limited insight into their own mental health concerns. The Court does not believe, based on the testimony and evidence presented, that they truly understand the magnitude of the challenges their children face. The Court does not find the testimony of either parent to be credible as to how they got to this place or how they plan to remedy the problems that resulted in the children being removed.

Journal Entry, August 24, 2022, p. 17

**{¶37}** The trial court also found that GCCS made reasonable efforts to finalize a permanency plan and to eliminate the continued removal of the children from the home and have attempted to make it possible for the children to return home, but the parents were unable to remedy the reasons leading to the removal of the children. The court found that it was in the best interest of the children that the parental rights of the Father and Mother were terminated and that permanent custody be granted to GCCS.

**{¶38}** A.P. filed a timely appeal and submitted two assignments of error:

**{¶39}** "I. THE TRIAL COURT ERRED IN ALLOWING THE MOTION FOR PERMANENT CUSTODY TO PROCEED AND/OR IN GRANTING THE MOTION DUE TO A LACK OF REASONABLE EFFORTS BY THE GUERNSEY COUNTY CHILDREN SERVICES AGENCY."

{¶40} "II. THE TRIAL COURT ABUSED ITS DISCRETION BY NOT PROPERLY CONSIDERING THE BEST INTERESTS OF THE CHILDREN AS REQUIRED BY R.C. § 2151.414(D)."

### STANDARD OF REVIEW

{¶41} As to our standard of review, generally we review the trial court's decision in this context for abuse of discretion. We would examine the entire record and determine whether there is sufficient competent and credible evidence to support the judgment rendered by the trial court. *Seasons Coal Company v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1978). *Trickey v. Trickey,* 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). The trial court must resolve disputed issues of fact and weigh the testimony and credibility of the witnesses. *Bechtol v. Bechtol,* 49 Ohio St.3d 21, 23, 550 N.E.2d 178 (1990). We would defer to the trial court's discretion because the trial court had the opportunity to observe the witnesses and parties in weighing the credibility of the proffered testimony in a way a reviewing court cannot.

### BURDEN OF PROOF

{¶42} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169(1990), quoting *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551(1972). A parent's interest in the care, custody and management of his or her child is "fundamental." *Id.; Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599(1982). The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45(6th Dist. 1991).

Therefore, parents "must be afforded every procedural and substantive protection the law allows." *Id.*

**{¶43}** An award of permanent custody must be based upon clear and convincing evidence. R.C. 2151.414(B)(1). The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986).

**{¶44}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶45}** Following the hearing, R.C. 2151.414(B)(1) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a)     The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one

or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b)      the child is abandoned;

(c)      the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d)      the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

**{¶46}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**{¶47}** In her first assignment of error, A.P. contends the trial court erred by allowing the motion for permanent custody to proceed because GCCS failed to use reasonable efforts. She argues that GCCS's referral to Goodwill Parenting in Canton to address the special needs of the children was not reasonable due to the prohibitive cost and the lack of transportation. She also contends she was not permitted to visit with her children for several months prior to the hearing on the motion for permanent custody and that she was assigned "several caseworkers" but provides no argument or explanation regarding how these allegations impact the analysis of the efforts of GCCS.

**{¶48}** Overall, Ohio's child welfare laws are designed to care for and protect children, "whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A). To that end, various sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit, including the requirement that the agency prepare and maintain a case plan with the goal to eliminate the need for the out-of-home placement so that the child can safely return home (R.C. 2151.412) and the burden on the agency to prove it made reasonable efforts to prevent the child's removal (R.C. 2151.419).

**{¶49}** The agency's duty to use reasonable efforts applies only to efforts to avoid removal of a child from their home or to reunify the child with the family following removal. *In re Warren*, 5th Dist. Stark No.2007CA00054, 2007-Ohio-5703. While the agency did not have to show reasonable efforts at the permanent custody hearing, to the extent that the trial court relied on R.C. 2151.414(E)(1) at the permanent custody hearing, the court must examine the reasonable case planning and diligent efforts by the agency to assist

the parents when considering whether the child cannot and should not be placed with the parent within a reasonable time. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 42. The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. *In re J.D.*, 3rd Dist. Hancock No. 5-10-34, 2011-Ohio-1458, ¶ 14. The child's health and safety is paramount in determining whether reasonable efforts were made. *In re R.P.,* 5th Dist. Tuscarawas No. 2011AP050024, 2011-Ohio-5378, ¶ 47.

{¶50} A.P. focuses her argument regarding reasonable efforts on the requirement that she obtain parenting skills that would permit her to parent children with behavioral problems. She complains and GCCS conceded that the program in Canton was prohibitively expensive and that transportation to the program was not available. While A.P. was not able to attend that program or any similar instruction, the representative from GCCS clarified that the motion for permanent custody was not filed because the parents did not complete the parenting class. (Trial Transcript, p. 182, lines 13-16).

{¶51} The program that was discussed at the hearing was described as a sixteen week program for multiple evenings each week. The testimony of Dr. Aimee Thomas regarding the parents' cognitive abilities and mental health issues in conjunction with the described behaviors of the children individually and as a group provided a reasonable basis for the trial court to conclude that parents would not be able to successfully apply what they learned and that they would once again be overwhelmed by the challenge of raising these children in one home. Dr. Thomas, speaking in the context of basic parenting class, stated that "[g]iven concerns with both [M.K.'s] learning issues, as well as [A.P.]

issues, I had concerns that they would be able to recite information but not necessarily apply it." (Thomas Deposition, p. 13, line 25 to p. 14, line 3). The trial court could reasonably conclude that the same concern would apply to a more intensive parenting program.

**{¶52}** Even if the parents could attend the specialized parenting program, the severity of the children's mental health issues and the cognitive issues suffered by the parents support a conclusion that inability to provide access to the training was not the basis for seeking or granting permanent custody. Dr. Thomas described A.P.'s ability to internalize and apply complicated parenting techniques as limited at best because she possessed the problem-solving aptitude of a seven-year-old. Her completion of a lengthy parenting program would not resolve that disability and, relying upon the evaluation of Dr. Thomas and the balance of the record, there is no support for a finding that A.P. would be able to successfully apply the techniques that she might learn.

**{¶53}** Each of the children currently require the constant focus of trained professionals and, while they are making progress in their own way, they present serious challenges to the skills of the staff of their respective residential treatment centers. The trial court was offered no evidence to support a conclusion that if A.P. had been able to attend a class that provided training to parent troubled children, she would be better prepared than the experts caring for her children.

**{¶54}** Consequently, the trial court's finding that reasonable efforts were made is not undermined by the failure to finance the parent's participation in a program that Dr. Thomas contended the parents may not be able to apply.

*{¶55}* We also find that the termination of visitation does not have any impact on the finding of reasonable efforts. First, A.P. provides only a conclusion that it interfered with reunification, but no argument to support her conclusion. GCCS halted visitation and noted that the behavior of the children improved. On February 28, 2022 Father filed a motion requesting the trial court order visitation, noting that he last visited M.K. and E.K. in August 2021. and A.P. filed a similar motion thereafter. The trial court found "[n]either the Agency, the CASA nor the GAL would recommend any visitation with the parents and the children based upon the current situation. Clearly, these children have many problems as the result of the parenting, or the lack of parenting of the Mother and Father. The best interests of the children dictate that there be no visitation with the children until further order of this court." (Journal Entry, July 1, 2022, p. 3). The children's health and safety are the paramount concern when evaluating reasonable efforts and the trial court's ruling is consistent with that requirement. *In re R.P., supra.*

**{¶56}** We have reviewed the entire record and find that the trial court did not abuse its discretion in finding that agency's case planning and efforts were reasonable and diligent under the circumstances of the case. The parents took advantage of the services and recommendations of GCCS, but the underlying problems that led to the removal of the children from the home nevertheless were not resolved.

**{¶57}** The first assignment of error is denied.

**II.**

**{¶58}** In her second assignment of error, A.P. argues that "the trial court abused its discretion by not properly considering the best interests of the children as required by R.C. § 2151.414(D)." In her abbreviated argument, she states "had she been provided

the necessary services, i.e., parenting classes specifically designed for children with behavioral problems, the family could have been reunited and kept together. There is no higher standard of "best interest" than a natural parent raising her own flesh and blood." (Appellant's Brief, p. 5).

{¶59} The record shows that the children were taken into the custody of GCCS on October 1, 2020, adjudicated dependent December 15, 2020 and remained in the custody of GCCS until February 25, 2022, the day the motion for permanent custody was filed, so the children had "been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *." R.C. 2151.414(B)(1)(d). The trial court also found that the children could not be placed with the either of the child's parents within a reasonable time, and that finding is supported by the record. The CASA offered unrebutted testimony that the children could not be reunified with the parents if they were given additional time, and the evidence of the mental health issues that afflict each family member supports that conclusion. Consequently, we find that the trial court did not err when it found that the children cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶60} The trial court moved to an analysis of the best interest of the children, referring to the elements described in 2151.414(D)(1)(a)-(e). The trial court completed a thorough analysis of the facts supporting its conclusion for each of the elements listed in 2151.414(D)(1) and concluded that the children needed a legally secure placement that could not be achieved without a grant of permanent custody to the agency. The trial court provided a succinct analysis of its findings in a concluding paragraph:

The Court finds that GCCS has made diligent and reasonable efforts to finalize a permanency plan for M.K., A.K. by providing referrals for service, exploring kinship, case management, and exploring permanency planning. GCCS has made reasonable efforts to eliminate the continued removal of the minor children and have attempted to make it possible for the children to return home to the mother and/or father. The parents have been unable to remedy the reasons for the children being removed in the first place. GCCS has established a safe, stable and secure environment for M.K., A.K., and E.K.

Journal Entry, Aug. 24, 2022, p. 16

{¶61} A.P. does not direct us to any evidence in the record to support her conclusion that her attendance at the specialized parenting class would have altered the outcome of this case. The evidence does support a conclusion that A.P.'s cognitive status and the problems suffered by the children would overwhelm her ability to parent the children, even had she taken the class.

{¶62} The trial court did not err in finding that the record contains clear and convincing evidence that the best interest of the children will be served by granting permanent custody to GCCS and that permanent custody was supported by the facts in the record.

{¶63} A.P.'s second assignment of error is denied.

**{¶64}** The August 24, 2022 decision of the Guernsey County Court of Common Pleas, Juvenile Division is affirmed.

By: Baldwin, J.

Wise, Earle, P.J. and

Gwin, J. concur.