[Cite as *In re N.K.*, 2026-Ohio-1087.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN THE MATTER OF:<br><br>N.K.<br><br>K.K. | Case No. 2025 CA 0075<br>2025 CA 0076<br><br><u>Opinion And Judgment Entry</u><br><br>Appeal from the Licking County Court of Common Pleas, Juvenile Division, Case Nos. F2023-0406 and F2023-0407<br><br>Judgment:  Affirmed<br><br>Date of Judgment Entry: March 26, 2026 |

**BEFORE:** William B. Hoffman; Craig R. Baldwin; David M. Gormley, Judges

**APPEARANCES:** JENNY WELLS, Prosecuting Attorney, KENNETH W. OSWALT, Assistant Prosecuting Attorney for Plaintiff-Appellee LCJFS; JERMAINE L. COLQUITT, for Defendant-Appellant, Mother.

*Baldwin, J.*

{¶1}   The appellant, M.K., appeals the judgment of the Court of Common Pleas, Juvenile Division, Licking County, Ohio, awarding permanent custody of N.K. and K.K. ("the children") to the Licking County Job and Family Services Division ("the Agency"). The appellee is the State of Ohio.

**STATEMENT OF FACTS AND THE CASE**

{¶2}   On July 31, 2022, N.K. was born. On June 11, 2023, K.K. was born. The appellant is the biological mother. Paternity has not been established for either child.

{¶3}   On October 27, 2023, the Agency removed the children from the appellant's care. On October 30, 2023, the Agency filed dependency complaints, and the children

were placed in the Agency's emergency shelter care. On December 13, 2023, the children were adjudicated dependent, and temporary custody was granted to the Agency on December 15, 2023.

{¶4} On March 26, 2025, the Agency filed a motion for permanent custody.

{¶5} The trial court held a permanent-custody hearing on July 21, 2025. At the hearing, the parties stipulated to the admission of a statement from the appellant's outpatient therapist, Lisa Green, and business records from BHP of Central Ohio regarding the appellant. Ms. Green's statements and those records reflected progress in the appellant's ongoing mental-health treatment.

{¶6} C.M. testified that she and her husband, M.M., are the children's foster parents. The children were placed in their home on October 27, 2023, and have remained there continuously since that time. According to C.M., the children are bonded with each other and with their foster parents. They have also become acquainted with their foster family's extended family. C.M.'s parents and sisters regularly visit with the children, as M.M.'s mother does. M.M. also has a brother with three children in Georgia. When they visit, the children enjoy spending time with their cousins.

{¶7} N.K. is physically and developmentally on track, but has previously suffered trauma before entering the foster home. N.K. normally behaves like a typical toddler; however, she struggles emotionally and has difficulty sleeping after visits with the appellant.

{¶8} At the time of the hearing, the children visited with the appellant every other week. This changed from weekly visits due to N.K.'s struggle to regulate emotionally following the visits. She has exhibited aggressive behavior toward her brother after visits

with the appellant. Since N.K.'s visits with the appellant have been changed from weekly to every other week, she has noticed improvement in N.K.'s behavior.

{¶9} N.K. needs ongoing trauma therapy due to what she experienced while under the appellant's care. She is currently on a wait list for ongoing trauma therapy. K.K. has significant needs involving physical therapy, occupational therapy, and speech therapy. Early on, he had to wear braces on his legs to help him walk. He has worked hard and is doing well now.

{¶10} C.M. testified that over the two years the children have been in their care, C.M. and M.M. have taken the children to forty or fifty medical appointments. The appellant has attended a few recent appointments for K.K. after the Agency filed for permanent custody, but has never attended any of the mental-health appointments for N.K.

{¶11} C.M. testified that the children are bonded with her and her husband and that, if permanent custody were granted, they hope to adopt the children.

{¶12} C.M. had to block the appellant's text messages because, if the appellant missed a call or visit, she would bombard C.M. with messages accusing C.M. of keeping the children from her. Thereafter, the parties communicated through a notepad facilitated by the Agency.

{¶13} Jennifer Quinn testified that she is an ongoing caseworker with Licking County Job and Family Services. The Agency removed the children from the appellant's care because of concerns regarding the appellant's mental health, her lack of access to or failure to take prescribed mental-health medication, substance-abuse concerns, concerns that the children's special needs were not being met, and concerns regarding the

children's living conditions. They were sleeping on the floor and running around with soiled diapers.

{¶14} The Agency developed a case plan for the appellant with the stated goal of reunification. The appellant was to complete substance-abuse and mental-health assessments, maintain safe and stable housing with sufficient space for her and the children, complete random drug screens, attend a domestic-violence program, and maintain a stable income.

{¶15} The appellant has maintained stable housing for approximately one year. During visits, Ms. Quinn observed food, dirty dishes, lighters, and medication lying around. She also frequently observed dog feces on the floor. Boxes were left on the stove, and there were signs that other people were living there, including someone else's medication lying on the table. The appellant indicated she babysits a child, and that was the child's medication. The house was typically cleaner when she was living by herself, without others staying with her.

{¶16} During an unannounced visit, Ms. Quinn detected a strong odor of marijuana when the appellant opened the door. A child was in a playpen. The appellant stated that a friend, the friend's husband, and their two children had needed a place to stay, and that they had been living with her for approximately two to three months. The appellant had not informed the Agency before the unannounced visit that those individuals were residing with her. Those individuals had a history with the Agency. The Agency instructed the appellant to remove them from her residence, and although she eventually did so, Ms. Quinn testified that it took a long time.

{¶17} At another point during the pendency of the case, the Agency learned that another child had been living with the appellant. This child was a runaway and had an

active case with the Agency. Another woman and her children were also living with the appellant at the time. According to Ms. Quinn, the woman stated that the appellant tried to get her to leave. She then said that if she had not been living there, the appellant would have died from an overdose.

**{¶18}** During that same period, the appellant also permitted a man to live in a vehicle parked in her front yard.

**{¶19}** By the time of the hearing, the appellant's boyfriend, K., had moved in with her. The appellant's boyfriend has a criminal history related to drugs and had been homeless before moving in with the appellant.

**{¶20}** Before moving into her current residence, the appellant had been married to T.W., and they lived with his grandmother. T.W. was charged with domestic violence against the appellant. At the time of the hearing, the appellant was still married to T.W. She was also in a previous relationship in which her then-boyfriend, A.K., was charged with domestic violence. The Agency expressed concern regarding the appellant's repeated involvement in abusive relationships. The appellant told the Agency she attended domestic-violence programs, but the Agency did not receive any confirmation that she completed them.

**{¶21}** The appellant completed a mental-health assessment and has participated in ongoing counseling at BHP. There, she was diagnosed with post-traumatic stress disorder, borderline personality disorder, and bipolar disorder. She has been prescribed eight medications, but has not been consistent with taking them. When asked why she was not current, the appellant stated either that she had other medication or that she had decided to stop taking it for a while. Upon request, the appellant was unable to produce all the medications she was prescribed. She said she had just had them refilled, but could

not remember where she put them. The appellant's compliance with her prescribed medication continues to be an area of concern for the Agency.

{¶22} Ms. Quinn also testified that the appellant experienced significant mental-health episodes during the pendency of this case, including multiple suicide attempts and suicidal ideations, most recently in March of 2025. During her most recent attempt, the appellant reported that it occurred because a different former boyfriend, J., broke up with her. At least one of the suicide attempts involved taking pills. The appellant's mental health remains a concern for the Agency.

{¶23} As part of her case plan, the appellant was required to submit to drug screens. In every drug screen, the appellant generally tested positive for THC. In January and February of 2025, she tested positive for cocaine. The appellant initially denied taking the cocaine, stating that it was transferred when she kissed her boyfriend at the time. Later, after that relationship ended and the boyfriend was charged with domestic violence, the appellant said she no longer had a reason to use cocaine because she was no longer with him. Sixteen months into the case plan, the appellant was still testing positive for illicit substances.

{¶24} In January 2025, the Agency requested that the appellant obtain new drug and alcohol evaluations. She did not get one immediately, but did so after the Agency filed a motion for permanent custody. Although the appellant self-reported that she was attending classes, the Agency has not received any documentation showing completion of an updated drug-and-alcohol treatment program.

{¶25} Ms. Quinn testified that the court ordered visitation to occur no less than biweekly, and that N.K. had difficulty regulating her emotions after visits. No psychological evaluation had been performed to determine the cause of this behavior.

**{¶26}** Ms. Quinn is also aware of the communication issues between C.M. and the appellant. Ms. Quinn advised C.M. to block the appellant.

**{¶27}** The Agency investigated potential familial matches but found none suitable. The appellant has no extended family in the area. Ms. Quinn believes the children have bonded with their foster parents.

**{¶28}** Ms. Quinn believes the children need permanent stability in their lives and that it is best achieved through granting the motion for permanent custody. The appellant is not close to obtaining unsupervised visits.

**{¶29}** On cross-examination, Ms. Quinn read a letter from the appellant's counselor. The letter confirmed that the appellant had been taking her medications consistently, reported more stable mental health, was working two jobs, and was taking steps to make her home environment safe for her children. Her most recent drug screen tested negative for all substances except marijuana. At the start of the case, the appellant self-reported that she had been involved with methamphetamine. She has not tested positive for it throughout the pendency of this matter.

**{¶30}** Ms. Quinn also testified that the appellant is in and out of employment, having had ten different employers since the start of the case. At the time of the hearing, she was working two jobs, totaling thirty-five hours per week.

**{¶31}** Ms. Quinn further testified regarding her observations of the appellant during visitation. She had to speak with the appellant about leaving her marijuana out of the visitation room and about her hygiene. The appellant smelled of body odor; she was not using deodorant or bathing, and her hair was greasy. Ms. Quinn had to remind the appellant not to carry the highchair with N.K. in it, to be careful about what she gives K.K. due to his chewing and swallowing issues, and not to put the children on her shoulders.

During the visits, N.K. was apprehensive around the appellant, wanting to be picked up by Ms. Quinn and taken home.

{¶32} The appellant never connected with a parenting mentor. At the time of the hearing, she was still taking parenting classes and had not completed them.

{¶33} Mark Poole testified that he is the Guardian Ad Litem for the children. He investigated potential placements. The appellant's parents indicated they could not take the children, and the appellant did not provide any other potential placements. He believes it is in the best interest of the children to be placed in the permanent custody of the Agency due to the appellant's long history of substance abuse, her history of abusive relationships, questions regarding income stability, and significant emotional and mental-health concerns, including two suicide attempts.

{¶34} Next, Peggy Rich testified that she had known the appellant since the appellant moved across the street from her a year prior to the hearing. She testified that she has no knowledge of the appellant's current boyfriend, K., being domestically violent toward the appellant.

{¶35} Kaylie Hartless testified that the appellant babysits her son and is one of her best friends. Her son takes Adderall, trazodone, and risperidone, and the appellant administers those medications when she is babysitting him. Ms. Hartless has known the appellant for approximately one year. She does not have any concern about the appellant watching her child, even though she had a recent suicide attempt.

{¶36} Finally, the appellant testified on her own behalf. She is the mother of N.K. and K.K. She does not currently have a relationship with the foster family. The appellant said she never asked the foster family for money or to stay at their house. She explained that what had been described as her latest suicide attempt was suicidal ideation. After a

fight with her significant other, she threatened to end her life and was admitted for medical treatment and placed on medication.

{¶37} The appellant attends counseling twice per month, has made significant progress, and was told at her last session that she needed to attend only once per month. She believes she has a strong support structure through her church.

{¶38} She visits with her children biweekly. During her visits, she plays a movie, brings toys from her home, and brings snacks. N.K. likes playing tag with her brother and with the appellant. She was told about N.K.'s emotional issues following the visits; however, the Agency has not worked with her to help address the situation. The appellant believes N.K.'s behavior reflects that she missed her. She believes she is bonded with both her children.

{¶39} The appellant believes she can adequately care for her children and manage their various medical issues. She believes the foster family chooses not to tell her about certain appointments. She believed the income from her jobs was enough to provide for her children's needs.

{¶40} The appellant testified that if dog feces were present, it was due to house-training the dog and that she always cleaned it up promptly. She denied leaving the children in soiled diapers. She said she always changed them promptly. She acknowledged that her current boyfriend, K., has a criminal history, but believed his convictions were misdemeanors relating to his prior drug use approximately five years earlier. She had just filed for divorce from her husband.

{¶41} The appellant has completed various counseling and classes related to domestic violence, substance abuse, and parenting. She uses marijuana daily and, from her own personal research, has concluded that it does not negatively interact with any of

the medications she currently takes. She has not smoked inside her house for approximately two weeks and instead smokes outside now.

{¶42} She believes it is in her children's best interest to come home with her. She is requesting that the court grant her unsupervised visits, as it will help with her depression and anxiety.

{¶43} Following the hearing, the trial court granted the Agency's motion for permanent custody.

{¶44} The appellant filed a timely notice of appeal and raises the following three assignments of error:

{¶45} "I. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY DENYING MOTHER'S REQUEST FOR A CONTINUANCE TO SECURE LIVE TESTIMONY FROM A KEY MENTAL-HEALTH PROVIDER, WHERE MENTAL HEALTH WAS A CENTRAL ISSUE AND THE COURT LATER RELIED ON THAT SUBJECT IN GRANTING PERMANENT CUSTODY."

{¶46} "II. THE TRIAL COURT ERRED IN FINDING THAT THE CHILDREN COULD NOT BE PLACED WITH MOTHER WITHIN A REASONABLE TIME PURSUANT TO R.C. 2151.414(B)1(A), BECAUSE THE FINDINGS UNDER R.C. 2151.414(E)(1), (E)(2), (E)(4), (E)(8) AND (E)(16) AS TO MOTHER ARE NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. R. AT 102"

{¶47} "III. THE TRIAL COURT'S BEST-INTEREST DETERMINATION UNDER R.C. 2151.414(D)(1) IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

# I.

**{¶48}** In her first assignment of error, the appellant argues the trial court erred in denying her motion for a continuance. We disagree.

## STANDARD OF REVIEW

**{¶49}** An appellate court will not reverse a denial of a continuance in a permanent custody case absent an abuse of discretion. *In re D.A.*, 2023-Ohio-2823, ¶41 (5th Dist.). "In reviewing a juvenile court's decision to deny a continuance, an appellate court conducts a balancing test, weighing any potential prejudice to the movant against the juvenile court's ability to control its own docket and promptly and efficiently affect justice." *Id.* "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

## ANALYSIS

**{¶50}** The appellant argues that a continuance was necessary so that her mental-health counselor could testify in person. But the counselor's written statement was admitted into evidence by stipulation, and the appellant made no proffer of additional testimony.

**{¶51}** The request for a continuance was entirely speculative. Whether the witness would have offered materially different or additional testimony beyond her written statement is conjecture. Moreover, the trial court had a legitimate interest in controlling its docket and ensuring the prompt and efficient administration of justice. See *In re D.A.* 2023-Ohio-2823 (5th Dist.). As such, the appellant has not shown that the denial of a continuance was unreasonable, arbitrary, or unconscionable.

**{¶52}** The appellant's first assignment of error is overruled.

## II., III.

{¶53} In her second and third assignments of error, the appellant argues that the trial court erred in finding that the children could not be placed with the appellant within a reasonable time and that permanent custody was in the children's best interest. We disagree.

{¶54} We elect to address the appellant's second and third assignments of error together.

## STANDARD OF REVIEW

{¶55} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972). A parent's interest in the care, custody, and management of his or her child is "fundamental." *Id.*, citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982). The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *Id.*

{¶56} The Ohio Supreme Court addressed the standard of review in permanent custody cases in *In re Z.C.*, 2023-Ohio-4703, ¶7:

> Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, "by clear and convincing evidence, that it is in the best interest of the child" to do so and that any of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance

of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

We have described an appellate court's task when reviewing a trial court's application of the clear-and-convincing-evidence burden of proof as follows: "Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990), citing *Ford v. Osborne*, 45 Ohio St. 1, 12 N.E. 526 (1887), paragraph two of the syllabus; *accord Cross* at 477.

* * *

. . . sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*Id*. at ¶7-8, 11.

{¶57} The Z.C. Court went on to define sufficiency of the evidence and manifest weight as follows:

Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are "'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517,

¶ 10, quoting *State v. Thompkins*, 78 Ohio St. 3d 380, 1997-Ohio-52, 678 N.E.2d 541 (1997), paragraph two of the syllabus. We have stated that "sufficiency is a test of adequacy," *Thompkins* at 386, while weight of the evidence "'is not a question of mathematics, but depends on its *effect in inducing belief*'" (emphasis sic), *id*. at 387, 678 N.E.2d 541, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id*. at 386. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when " 'the evidence is legally sufficient to support the jury verdict as a matter of law." ' " *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 3, 874 N.E.2d 1198, quoting *Thompkins* at 386, quoting *Black's* at 1433.

But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley* at ¶ 12. When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id*. at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe

their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id*. at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id*. at ¶ 13-14.

## ANALYSIS

**{¶58}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates that the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child.

**{¶59}** R.C. 2151.414(B)(1) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that 1) it is in the best interest of the child to grant permanent custody to the agency; and, 2) one of five circumstances outlined in R.C. 2151.414(B)(1)(a) through (e) applies. R.C. 2151.414(B)(1)(a) is applicable to the present case:

**(a)** The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a

consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶60} In practice, a trial court ordinarily determines whether one of the circumstances set forth in R.C. 2151.414(B)(1) exists before proceeding to a determination regarding the best interests of the child.

{¶61} The trial court must consider all relevant evidence before determining that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent. See R.C. 2151.414(E). The statute further provides that, if the trial court makes a finding under any of R.C. 2151.414(E)(1)-(15), it shall enter a finding that the children cannot or should not be placed with the parent. The existence of any one factor is sufficient to support such a finding. See *In re William S.*, 1996-Ohio-182.

{¶62} R.C. 2151.414(E) states, in pertinent part:

**(E)** In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot

be placed with either parent within a reasonable time or should not be placed with either parent:

**(1)** Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

**(2)** Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

\* \* \*

**(4)** The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

\* \* \*

**(8)** The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or disability of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

* * *

**(16)** Any other factor the court considers relevant.

**{¶63}** The appellant challenges the trial court's findings of fact on a sufficiency and manifest weight of the evidence grounds: (1) the Agency engaged in reasonable case planning and diligent efforts, (2) the appellant failed to remedy the conditions that caused removal, (3) that due to chemical dependency or mental illness the appellant is unable to provide an adequate permanent home for the children at the time of trial or within one year, (4) that the appellant failed to regularly support, visit, or communicate with the children when able to do so, (5) that the appellant has repeatedly withheld medical treatment or food from the children, (6) other relevant findings that the children cannot or should not be placed with the appellant within a reasonable time pursuant to R.C. 2151.414(E)(16), and granting the Agency permanent custody of the children is in the best interest of the children.

**{¶64}** Much of the appellant's argument rests on the proposition that, after the Agency filed its motion for permanent custody, she made progress on her case plan. The appellant argues that the court incorrectly weighed early inconsistencies with her case plan as more significant than the progress she made later in the case. However, "[b]elated and sporadic attempts to cooperate with a case plan are insufficient compliance to warrant reunification." *In re Wilson*, 1999 Ohio App. LEXIS 533 (8th Dist. Feb. 18, 1999).

**The children cannot be placed with the appellant within a reasonable time or should not be placed with the appellant**

**Reasonable case planning and diligent efforts**

{¶65} The record reflects that, on six separate occasions beginning October 31, 2023, the trial court found that the Agency made reasonable efforts to reunify the appellant with the children. The appellant did not object to any of those findings and did not seek any substantive modification of the case plan pursuant to R.C. 2151.412(F)(2).

{¶66} The appellant argues that the Agency's reduction of visitation demonstrates a lack of reasonable efforts. However, the record does not support that argument. The Agency reduced visitation from weekly to every other week because N.K. had difficulty regulating her emotions after visits and exhibited aggressive behavior toward K.K. In addition to in-person visits every other week, the Agency arranged FaceTime contact every other Friday. The appellant often missed calling on time and then blamed the foster parents for the missed contact. The record clearly demonstrates that the modification of visitation was tied to N.K.'s emotional response, not to any abandonment of reunification efforts by the Agency.

{¶67} The appellant also argues that she substantially complied with the case plan. But the record supports the trial court's contrary conclusion. The goals of the case plan were for the appellant to achieve sobriety and lead a healthy, sober lifestyle, have healthy relationships that support her sobriety, be emotionally and mentally stable and will make positive decisions in order to provide her children with safety and stability, have adequate income to support herself and her children, have a safe, stable home environment free from safety hazards, and identify the children's fathers. To accomplish those goals, the

case plan required the appellant to (1) schedule, participate in, and complete a substance abuse assessment in order to determine the ongoing need for services and cooperate with all recommendations; (2) schedule, participate in, and complete a mental health assessment in order to determine the need for ongoing treatment and services; (3) complete random drug screens; (4) participate in an Agency approved parent education program in order to learn how her choices and behaviors impact her ability to provide her children with safety and stability; (5) sign necessary release of information forms related to the services in which she is engaged; (6) participate in a relationship/domestic violence program to learn the red flags in relationships; (7) establish and maintain adequate income in order to meet her own needs and the needs of her children; and (8) establish and maintain safe, stable housing with sufficient space for herself and the children.

{¶68} Although the appellant made some progress toward the end of the case, the trial court was permitted to view that progress in light of the entire history of the matter. The record shows that for much of the pendency of the case, the appellant continued to test positive for THC, tested positive for cocaine twice, admitted daily marijuana use, struggled with medication compliance, and had not successfully completed mental-health treatment, parenting education, or updated substance-abuse treatment. The record also shows that she remained involved in unstable and unsafe relationships, including relationships marked by domestic violence and drug-related issues. Her current boyfriend had recently moved in, had a drug-related criminal history, and had been homeless before moving into the residence. The appellant also permitted other unstable individuals to reside in her home, including a juvenile runaway, a couple with prior Agency involvement, and a man living in a vehicle on her front yard.

{¶69} Additionally, the record supports the trial court's concern regarding the condition and safety of the home. Ms. Quinn described the home as cluttered and frequently dirty, with dog feces on the floor, medication left accessible, and signs that other individuals were living there without the Agency's prior knowledge. The appellant also worked for approximately ten different employers during the case, further supporting the trial court's concern regarding stability.

{¶70} The record makes clear that the appellant's late efforts did not remedy the underlying problems or substantially comply with the case plan. The trial court did not clearly lose its way or create a manifest miscarriage of justice in so finding.

### Chemical Dependency or Chronic Mental Illness

{¶71} R.C. 2151.414(E)(2) provides an additional basis for concluding that a child cannot be placed with a parent within a reasonable amount of time or should not be placed with a parent. It reads:

> Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

{¶72} Again, the appellant's argument focuses on the final months of the case. The broader record, however, supports the trial court's conclusion. The appellant tested positive for cocaine twice on random drug screens; she consistently tested positive for THC and testified to daily use. Although she testified that she has a prescription for marijuana, she also acknowledged that she has not disclosed the use to her medical

provider and instead concluded, based on her own research, that it did not negatively interact with her prescribed medications.

{¶73} The record also reflects unresolved mental health concerns. The appellant was diagnosed with post-traumatic stress disorder, borderline personality disorder, and bipolar disorder, and had been prescribed eight medications. Yet Ms. Quinn testified that the appellant was inconsistent in taking those medications and could not account for all of them. The appellant also experienced multiple suicide attempts and suicidal ideations during the case, including a hospitalization in March 2025, only a few months before the permanent custody hearing.

{¶74} The appellant argues that no expert opinion on her mental health was presented by the Agency and that the caseworker's testimony was insufficient. That argument is unpersuasive. A caseworker may offer lay-opinion testimony regarding a parent's functioning and observed mental-health-related concerns in a permanent-custody proceeding. *In re S.D-S.*, 2024-Ohio-255, ¶38 (8th Dist.). Here, moreover, the caseworker's testimony was not presented in a vacuum; it was supported by the appellant's diagnoses, medication history, hospitalization history, and ongoing treatment needs.

{¶75} The record demonstrates that the trial court did not clearly lose its way or create a manifest miscarriage of justice in finding that the children cannot be placed with the appellant within a reasonable time, or that they should not be placed with the appellant.

### Lack of commitment or unwillingness to provide an adequate permanent home

{¶76} R.C. 2151.414(E)(4) provides another basis for concluding that a child cannot be placed with a parent within a reasonable amount of time or should not be placed with a parent. It reads:

> The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶77} The trial court's conclusion that the appellant lacked the commitment or willingness to provide an adequate permanent home for the children was based on both the condition of her home and the individuals she permitted to reside there. At the time of the hearing, she was married to an individual in prison for domestic violence, she has been in multiple relationships where domestic violence was an issue, the week before the hearing on permanent custody she invited her new boyfriend, a homeless man with a history of drug issues and a criminal record related to drugs, to live with her, she had a juvenile runaway stay with her, a couple with a history of involvement with the Agency to stay with her, and allowed a man living in his vehicle to park it on her yard.

{¶78} In addition, the home was described as routinely messy, with dog feces on the floor and other people's medication within easy reach of children.

{¶79} Also relevant, the children have been with their foster family for two years and have had forty to fifty medical appointments. The appellant only recently began attending K.K.'s appointments after the Agency filed a motion for permanent custody. The Guardian Ad Litem also described the appellant as failing to follow through with the services offered by the Agency.

{¶80}The record demonstrates that the trial court did not clearly lose its way or create a manifest miscarriage of justice in finding that the children cannot be placed with the appellant within a reasonable time, or that they should not be placed with the appellant.

**Withholding of Food or Medical Care**

{¶81} R.C. 2151.414(E)(8) provides another basis for concluding that a child cannot be placed with a parent within a reasonable amount of time or should not be placed with a parent. It reads:

> The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or disability of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

{¶82}The trial court based this conclusion on evidence that, when the children were placed in the Agency's temporary custody, K.K., then an infant, required ongoing physical therapy and speech therapy and, at one point, braces for his legs. The appellant had not addressed those conditions. She could not identify the children's pediatrician, stating only that he was in Florida, even though the family was living in Licking County, Ohio. The Agency's case plan also reflected concerns that the appellant was not adequately feeding the children.

{¶83}Although the appellant disputed some of those concerns, the trial court was entitled to weigh the witnesses' credibility. The record demonstrates that the trial court did not clearly lose its way or create a manifest miscarriage of justice in finding that the

children cannot be placed with the appellant within a reasonable time, or that they should not be placed with the appellant.

## Other Relevant Factors

{¶84} R.C. 2151.414(E)(16) allows a trial court to rely upon "[a]ny other factor the court considers relevant" when concluding that a child cannot be placed with a parent within a reasonable amount of time or should not be placed with a parent.

{¶85} The case plan instructed the appellant to identify the children's fathers. The appellant has failed to identify the children's fathers or provide a reason why she will not. There are numerous reasons for the trial court's instruction on this, including providing monetary and parenting support. However, the appellant chose not to complete this portion of the case plan.

{¶86} Furthermore, the trial court found that the appellant failed, continuously and repeatedly, to substantially remedy the conditions that led to the children being placed with the Agency. This was evidenced by her failed drug tests, her unwillingness to provide verification of her completion of programs required by the case plan, her engagement in relationships fraught with domestic violence, and her lack of engagement with the Agency.

{¶87} Although some of the same facts were also analyzed under R.C. 2151.414(E)(1) and R.C. 2151.414(E)(2), the statute does not prohibit that approach, and the appellant fails to cite to any relevant legal authority establishing otherwise. Accordingly, the appellant has failed to demonstrate that the trial court lost its way and created a manifest miscarriage of justice that requires reversal and a new hearing.

## b. Best Interest of the Children

{¶88} The statutory best interest test is set forth in R.C. 2151.414(D)(1):

**(1)** In determining the best interest of the child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

**(a)** The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child;

**(b)** The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

**(c)** The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

**(d)** The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

**(e)** Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶89} The trial court must consider each relevant factor under R.C. 2151.414(D)(1) when determining whether permanent custody is in the child's best interest. *In re M.K.*,

2023-Ohio-3786, ¶33 (5th Dist.). No one factor is given greater weight than another. *Id.* "A child's best interests are served when the child is placed in a permanent situation which fosters growth, stability, and security." *Id.* at ¶36.

{¶90} In the present case, the record shows that the children are very bonded to their foster family and are thriving under the foster parents' care. The foster parents are willing to adopt the children and provide them with permanent stability. The children are also bonded with their foster parents' extended family.

{¶91} The children have been in the care of the same foster family for more than half of their lives. N.K. was removed from the appellant's care at fifteen months old. K.K. was removed as a four-month-old. At the time of the hearing, they had spent twenty months in the care of C.M. and M.M.

{¶92} The appellant's belated and limited engagement with the Agency's case plan demonstrates that reunification is not in the children's best interest.

{¶93} Again, the appellant was found to have withheld medical care from the children, relevant under R.C. 2151.414(E)(8). At the time the Agency acquired temporary custody of the children, K.K., aged four months, would require ongoing physical therapy, speech therapy, and had to get braces for his legs at one point. The appellant had never addressed any of these conditions. She could not identify the children's pediatrician, only saying that he was in Florida. They were living in Licking County, Ohio, at the time.

{¶94} Accordingly, the trial court did not clearly lose its way or create a manifest miscarriage of justice requiring reversal.

{¶95} The appellant's second and third assignments of error are overruled.

## CONCLUSION

**{¶96}** Based on the foregoing, the judgment of the Court of Common Pleas, Juvenile Division, of Licking County, Ohio, is hereby affirmed.

**{¶97}** Costs to the appellant.

By: Baldwin, J.

Hoffman, P.J. and

Gormley, J. concur.