[Cite as *In re M.L.*, 2026-Ohio-1815.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN RE M.L. | Case No. 2025 CA 00091 |
| | <u>Opinion And Judgment Entry</u> |
| | Appeal from the Licking County Common Pleas Court, Juvenile Division, Case No. F2023-0052 |
| | Judgment: Affirmed |
| | Date of Judgment Entry: May 18, 2026 |

**BEFORE:** Andrew J. King; Craig R. Baldwin; Robert G. Montgomery, Judges

**APPEARANCES:** JENNY WELLS, Licking County Prosecuting Attorney by KENNETH W. OSWALT, for Licking County Job and Family Services; LAURIE R. WELLS, Guardian Ad Litem; CHRISTOPHER L. TROLINGER for Appellants-Parents; and J.R. STREMSKI, Advocate for Children.

*Montgomery, J.*

**{¶1}** Mother and Father appeal the decision of the Licking County Court of Common Pleas, Juvenile Division, granting permanent custody of two minor children, S.L. and M.L. (referred to collectively as "children"), to Licking County Job and Family Services. For the reasons below, we AFFIRM.

**<u>STATEMENT OF THE CASE</u>**

**{¶2}** This matter involves a motion for permanent custody for two minor children, S.L. and M.L., who share biological mother, B.L. ("Mother") and father, J.L. ("Father"). At times throughout this Decision, Mother and Father will also be referred to

as "Parents." On February 9, 2023, Licking County Job and Family Services, hereinafter the "Agency," removed the minor children from Mother and Father. On February 10, 2023, the Agency obtained an ex parte order of removal and placed the children into foster care, where they have remained since that time.

{¶3} On February 13, 2023, the Agency filed Complaints in three (3) cases for (3) children, alleging that the children were dependent and requesting that they be placed in the temporary custody of the Agency.[1] That same day, the court granted emergency custody of the children to the Agency. On March 10, 2023, an initial case plan was filed with the court, setting forth numerous stated objectives and goals for reunification with Mother and Father.

{¶4} On April 19, 2023, the adjudicatory and dispositional hearings took place. The Parents did not appear at the hearing because they both were in jail at that time. By Judgment Entry filed on April 21, 2023, the children were adjudicated dependent and placed in the Agency's temporary custody. On January 17, 2024, JFS filed the respective motions for permanent custody ("PC"). After numerous pleadings, reviews, and continuances, the PC hearing finally took place over several days - April 1, 2025, April 2, 2025, May 13, 2025, June 24, 2025, August 11, 2025, and August 12, 2025. Mother and Father appeared with separate counsel and opposed the Agency's motion.

{¶5} The Agency called five (5) witnesses, Mother called seven (7) witnesses including herself, and Father called one (1) witness, himself. The court called the Guardian ad Litem as its own witness and admitted her three (3) written reports and recommendations. Said reports were admitted as the court's exhibits 1, 2, and 3. In

---

[1] As stated, one of the children is no longer a part of the case.

addition, on August 13, 2025, the court conducted an in-camera interview with the children. After reviewing the record in its entirety, on November 4, 2025, the trial court issued its thorough, detailed written decision granting the Agency's motion for permanent custody. Mother and Father timely appealed.

## STATEMENT OF RELEVANT BACKGROUND FACTS

**{¶6}** S.L. was born October 27, 2009, and M.L. was born on December 17, 2013. As stated above, on February 9, 2023, the Agency removed the children from Mother and Father. That day, New Albany police officers arrived at a gas station after reports were made to them that Mother and Father appeared to be under the influence of drugs or alcohol with children in the car and were behaving erratically. Agency caseworkers arrived and observed Mother rocking back and forth in the back of the police cruiser, dancing and singing as if on drugs, and did not interact well with the individuals on scene. Inside Mother and Father's vehicle, the officers found two (2) baggies of pills and a powder substance, a loaded firearm, multiple phones, multiple credit cards, multiple identification cards that did not belong to them, and a significant amount of jewelry. Although the police officers were present, no charges were filed at that time.

**{¶7}** When questioned, the Parents reported that they were <u>not</u> using any illicit substances, and only reported Father's prescriptions for Xanax, Oxycodone, and Wellbutrin. However, upon the Agency's initial contact with them that day, Mother tested positive for cocaine and fentanyl, and Father tested positive for cocaine, fentanyl, THC, and benzodiazepines. As a result, the Agency had immediate concerns regarding substance abuse, illegal activity, lack of parental supervision, and significant safety issues. The children confirmed to the Agency that they have observed this type of behavior from their Parents on multiple occasions prior to this incident. In fact, due to similar concerns,

the Parents have previous Agency history through Franklin County, Fairfield County, and Licking County.

{¶8} On February 23, 2023, the Parents were arrested for charges separate and apart from the events that took place on February 9, 2023, with the children. Mother was arrested for improper handling of a firearm and served 60 days in jail (this is why Mother was absent for the dispositional hearing in April, as referenced in the Statement of the Case). On May 22, 2023, Mother pled guilty and received community control probation for 3 years, which included assessment for mental health and substance abuse.[2] Father was arrested for possession of a fentanyl related compound. On December 8, 2023, Father pled guilty and was sentenced to 24 months in prison, with 177 days of jail credit. On September 24, 2024, Father was released.

{¶9} Upon initial intake, the assigned caseworker reviewed the Agency's concerns with the Parents to meet the goal of reunification. The Agency established a case plan outlining these objectives and filed it with the Court on March 10, 2023. The case plan identified several objectives to remedy the conditions that led to the children's removal, which included, but were not limited to, participating and completing a drug and alcohol treatment program; producing negative drug screens; participating in mental health assessments and recommended counseling; completing a parent education program and demonstrating appropriate parenting practices; addressing safety issues

---

[2] During her probation, Mother had two notices of probation violations for alcohol use. She did not receive an actual violation, but her terms and conditions of probation were modified. Mother was tested regularly at Brightview, a drug and alcohol treatment program, with the results sent to her probation officer. Mother was placed in residential treatment at Courage House following a probation violation in which she tested positive for alcohol. Although Mother originally attended Brightview as a term of her probation, the Agency received a report that she was unsuccessfully discharged *during the pendency of the PC hearing* on the State's Motion due to a lack of engagement with the program. Mother denied being "discharged" but did admit to inconsistent attendance.

affecting the children (including reports of truancy and hygiene issues, suicidal ideations, and possible cognitive delays); demonstrating a sober lifestyle to provide stability to the children; and demonstrating income stability.

{¶10} Regarding Mother, cocaine was routinely detected with respect to Agency samples collected on December 28, 2023; March 7, 2024; March 8, 2024; April 5, 2024; August 12, 2024, and November 19, 2024. And Father, who was incarcerated from February 2024 through September 24, 2024, had a positive cocaine sample on November 19, 2024. Many of these positive drug screens were after the Agency's motion for PC was filed. Further, as of April 2025 - fifteen months after the motion for permanent custody was filed - neither Mother nor Father had successfully completed drug treatment, despite being enrolled. Rather than address the Agency's legitimate substance abuse concerns, the Parents denied the results of Agency drug screens and claimed that most, if not all, of the positive drug screens were false-positives or were tampered with in some way. The Parents attempted to provide the Agency with their own drug screens from a third party.

{¶11} The Agency presented testimony from Bridget Lemberg, a certified scientist, who testified to the impossibility of false positives and described the sample testing process. Ms. Lemberg testified that different types of drug screens, such as the ones testified to by the Parents, have different cut off levels, which may explain the inconsistent results. Despite Ms. Lemberg's testimony, Mother and Father continue to assert false positives and tampering in this appeal. The Agency's drug results were admitted into evidence without objection.

**{¶12}** Upon removal from the home, the children were placed with a foster family, Michael and Lisa Radey, and have remained there for over three (3) years now.[3] Ms. Radey testified at the PC hearing that they make sure the children feel safe and secure, and that all their needs are being met. The testimony demonstrates that the children are doing well in their care. The trial court also conducted an "in camera" review with the children. ML and SL similarly testified that although they sometimes think about Mother and Father, they like their foster placement and wish to remain there. They discussed with the court Mother and Father's history of drug use and behavior in the home prior to their removal.

**{¶13}** The children initially had supervised visits with Mother and Father, but the visits caused emotional issues and began to demonstrate self-harm behavior. The Guardian Ad Litem ("GAL") testified regarding the emotional effects of seeing Mother and Father, stating "it would break them." *Tr.*, p. 481. At one of the supervised visits in September 2023, the children attempted to have a conversation directly with Mother and Father about the issues causing their removal, but the Parents continued to deny the existence of any issues. Thereafter, the children stated their wishes to have no further contact with their Parents. The GAL confirmed that after this specific visit, no one could convince the children that they would be safe with their Parents. The caseworkers and the GAL testified that they encouraged the children to consider some type of contact with

---

[3] Regarding kinship efforts, the children stayed with their maternal grandmother and aunt for one night pursuant to an emergency safety plan, however, said placement was not a long-term option due to dementia suffered by the maternal grandmother. A kinship home study was completed and approved on the paternal grandparents, and visitation with the children took place. However, the paternal grandparents permitted contact between the children and their father during said visitation, and they took the children to the home from which they were removed without Agency knowledge and/or approval. As a result, the Agency had ongoing concerns related to the paternal grandparents' ability to meet the mental health and trauma related needs of the children.

their parents, despite the Parents' continued claims that the children were being brainwashed to refuse contact. Despite the children's wishes, the Parents continued to attempt contact, through various avenues, like providing the children with electronic devices as gifts and those devices had location tracking capabilities activated.

{¶14} Indeed, initially, the Parents were permitted to send the children Christmas gifts at their foster placement, but a number of these gifts had to be returned or confiscated after the Agency determined that they were inappropriate, including iPads with personal messages to the children and location services turned on, blankets with photos of the parents and children, and a cell phone with photos and videos of the parents. Foster parent, Ms. Radey, testified about an incident where the children were receiving unusual friend requests on social media that Ms. Radey believed were the Parents' attempts at contact. Mother denied this allegation.

{¶15} The GAL testified about an incident when the Parents contacted other children in the foster home to attempt to contact their own children. The GAL also testified about another incident where the Parents reached out to the children's camp counselors while at summer camp attempting to make contact, and Mother encouraged family members to attend the children's sporting events. The GAL testified that the gifts and additional events surrounding access to the children resulted in the children being afraid that the Parents would be able to find them anywhere. The GAL stated the children had an ongoing belief that the Parents would find them and try to take them. Thus, after one of the supervised visits in September 2023, no one – including the Agency - forced the children to have visits with their Parents or extended family.

{¶16} In addition to the above, the Agency had significant concerns regarding Mother's mental health throughout these cases, and they have been unable to fully

monitor this issue due to Mother not being transparent with the Agency and her refusal to sign all releases of information for medical records. Mother was subject to involuntary emergency hospitalization due to her mental health issues in December of 2024, while in residential treatment at Courage House, after she reported to the physician that she was experiencing suicidal ideations and multiple personalities where she sometimes feels like a six (6) year old girl. At the hearing, Mother admitted she was hospitalized and did not inform the Agency of the incident but denied that she was suicidal or had multiple personalities. The GAL had similar concerns about Mother's mental health.

{¶17} The GAL filed her written reports and recommendations on July 18, 2024, October 8, 2024, and March 28, 2025. In each report, the GAL recommended that it would be in the best interests of the children for the Court to grant PC. The GAL also testified before the Court on August 11, 2025, and August 12, 2025, and similarly recommended that granting PC would be in the children's best interest. She based her recommendations on a number of concerns including the safety of the children, and her belief that the Parents will not make the children's safety a priority; the Parents' refusal to take responsibility for *or even acknowledge* the issues that caused the removal of the children; Mother's unaddressed mental health issues, the Parents' history of drug use and unwillingness to fully address this issue or admit there is an issue; the Parents' lack of honesty and full transparency with the Agency; the emotional and mental well-being of the children in light of the Parents not honoring the children's wishes to not have contact; and the children's consistent wishes that they stay with their foster family.

{¶18} It is true the Parents made some progress regarding some of the case plan objectives. They have tested negative for illicit substances since December of 2024, have engaged in some counseling, and enrolled in drug treatment. The Parents have

maintained their home and signed releases of information for the Agency (except Mother refused to sign a release for her medical records), and they both report that they have engaged in counseling. Both parents have completed parenting courses with approved providers. Despite progress, Mother and Father both continue to deny their history of drug use and their need for treatment, despite their lengthy history and the evidence of such. Indeed, Mother testified at the hearing that she does not currently have a drug or alcohol problem, has <u>never</u> had a drug or alcohol problem, and has never even used an illegal substance.

{¶19} Based on the record in its entirety, the court concluded that clear and convincing evidence was presented that, pursuant to R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E), the children cannot be placed with Mother or Father within a reasonable time or should not be placed with them based on R.C. 2151.414(E)(1), (4) and (16). After twenty-five (25) months (at the start of the hearing), and after thirty (30) months (at the conclusion of the hearing), of being offered reunification services, the Parents failed to make sufficient progress towards remedying the issues that led to the children's removal. The court further concluded that PC to the Agency was in both children's best interest. Mother and Father timely filed an appeal asserting five assignments of error.

## ASSIGNMENTS OF ERROR

{¶20} "I.     THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ITS RELIANCE UPON STATE'S EXHIBITS A THROUGH K THAT WERE NEVER OFFERED OR ADMITTED INTO EVIDENCE."

{¶21} "II.     ATTORNEYS FOR MOTHER AND FATHER PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THEIR RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTIONS 1, 10, AND 16 OF THE OHIO CONSTITUTION AND RC 2151.352."

{¶22} "III.   THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT REFUSED TO ORDER THAT THE STATE PROVIDE THE JFS RECORDS AND PROCEEDED IMMEDIATELY TO TRIAL IN VIOLATION OF APPELLANTS DUE PROCESS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTIONS 1, 10, AND 16 OF THE OHIO CONSTITUTION."

{¶23} "IV.    THE TRIAL COURT ERRED WHEN IT DETERMINED THAT THE STATE AND JFS ENGAGED IN REASONABLE EFFORTS TO MAKE IT POSSIBLE FOR THE CHILDREN TO RETURN HOME SAFELY PURSUANT TO R.C. 2151.419(A)(1) AS THIS FINDING IS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶24} "V.    THE TRIAL COURT'S GRANTING PERMANENT CUSTODY WAS NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, WAS AN ABUSE OF DISCRETION AND CONTRARY TO LAW AS THERE WAS INSUFFICIENT EVIDENCE TO SATISFY THE FINDINGS BY CLEAR AND CONVINCING EVIDENCE THAT SUCH PERMANENT CUSTODY TO THE AGENCY WAS IN THE CHILDREN'S BEST INTEREST AND THAT R.C. 2151.414(B)(1)(A) HAD BEEN SATISFIED."

## STANDARD OF REVIEW

{¶25} Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, "by clear and convincing evidence, that it is in the best interest of the child" to do so and that any of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. *In re A.W.,* 2024-Ohio-5791, ¶ 15 (5th Dist.).

{¶26} "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence." *In re V.C.*, 2024-Ohio-5153, ¶ 23 (4th Dist.), citing *In re C.S.*, 2019-Ohio-5109, ¶ 21 (4th Dist.).  If the children services agency presented evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588, ¶ 55 (4th Dist.); *K.H.*, 2008-Ohio-4825, ¶ 43; R.C. 2151.414(B)(1).

**{¶27}** "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Thus, "[w]here the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *In re N.K.*, 2026-Ohio-1087, ¶ 56, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

**{¶28}** The credibility of witnesses and the weight to be given the evidence are primarily issues for the trier of fact. *In re A.H.*, 2024-Ohio-4694, ¶¶ 30-31 (5th Dist.). "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984).

**{¶29}** Credibility determinations are best suited for the trial court and are "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 1997-Ohio-260; *see also*, *In re Christian*, 2004-Ohio-3146 (4th Dist.); *In re C.W.*, 2004-Ohio-2040 (2d Dist.). Thus, as an appellate court, we must neither weigh the evidence nor judge the credibility of the witnesses, our role is solely to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *In re M.K.*, 2023-Ohio-3786, ¶ 26 (5th Dist.).

**{¶30}** In conducting this deferential review, the court remains mindful that "the right to raise a child is an 'essential' and 'basic' civil right." *In re T.C.,* 2020-Ohio-882, ¶ 35 (5th Dist.); *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645 (1972). A parent has a fundamental liberty interest in the care, custody, and management of his or her child and an essential and basic civil right to raise his or her children. *Murray,* at 156. That right, however, is not absolute. "The natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." *In re R.M., Jr.*, 2018-Ohio-395, ¶ 23 (5th Dist.) quoting, *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). When a court determines whether to permanently terminate parental rights, the court must grant the affected parent "every procedural and substantive protection the law allows." *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

## APPLICABLE LAW

**{¶31}** R.C. 2151.414(B)(1) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency; <u>and</u> that one of the following applies:

(a)     The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's Parents within a reasonable time or should not be placed with the child's Parents;

(b)     The child is abandoned;

(c)     The child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d)     The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; * * *

(e)     The child or another child in the custody of the parent or Parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶32} Thus, R.C. 2151.414(B)(1) establishes a two-pronged analysis that the trial court must apply when ruling on a motion for permanent custody. *In re T.J.*, 2024-Ohio-110, ¶ 14 (5th Dist.); *In re A.M.*, 2020-Ohio-5102, ¶ 18. First, the court must find by clear and convincing evidence "that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies." *Id.* And second, the court must find by clear and convincing evidence that the grant of permanent custody is in the best interest of the child. *Id.*

{¶33} Relevant here, under (B)(1)(a), PC may be granted if the child cannot or should not be returned to the Parents within a reasonable time. *In re K.J.*, 2025-Ohio-4562 (9th Dist.). In making that determination, the court must consider the sixteen factors listed in R.C. 2151.414(E), as well as any other relevant evidence. *See* R.C. 2151.414(E). *Id.*, ¶ 19. Importantly, R.C. 2151.414(E) expressly states that if the court makes even <u>one</u> finding under R.C. 2151.414(E)(1)-(15), the court shall determine the children cannot or should not be placed with the parent. As such, a trial court shall base its decision that a child cannot be placed with a parent within a reasonable time or should

not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. *Id.*; *see In re William S.*, 1996-Ohio-182; *In re S.B.*, 2025-Ohio-2685, ¶ 17 (8th Dist.).

{¶34} Once the court makes the appropriate finding under R.C. 2151.414(B)(1), it must determine whether PC is in the best interest of the child. In determining the best interest of the child, R.C. 2151.414(D) mandates the trial court consider all relevant factors, including, but not limited to the following: (1) the interaction and interrelationship of the child with the child's Parents, siblings, relatives, foster Parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the Parents and child.

{¶35} The court must consider each factor enumerated in R.C. 2151.414(D), as well as any other relevant factors, and no one factor is given greater weight than the others. *In re Schafer,* 2006-Ohio-5513. A juvenile court does not need to specifically list or discuss each of the best-interest factors to meet the mandate that it "consider" the factors in R.C. 2151.414(D). *A.M.*, at ¶ 42. However, it must appear from the record that the trial court did in fact consider the factors listed as well as any other relevant factor. *Id.* (holding that although not required, it is preferable for a juvenile court to provide some discussion or analysis of the best-interest factors to aid in appellate review and to increase confidence in its decision).

{¶36} Importantly, the focus of the "best interest" determination is upon the child, not the parent. Indeed, R.C. 2151.414(C) expressly prohibits the court from considering the effect a grant of permanent custody would have upon the Parents. *A.W., supra*; *In re Awkal,* 85 Ohio App.3d 309 (8th Dist. 1994). As well, a child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. *T.C.*, ¶ 54.

## ANALYSIS

### 1. *Reliance on Evidence not Admitted*

{¶37} In the first assignment of error, Appellants claim the trial court erred in relying on State exhibits A through K, that were not admitted into evidence. Mother and Father claim "[t]he trial court relies extensively upon these exhibits in its decision." *Appellants' Brief*, p. 17. This argument is without merit. A review of the Judgment Entry and the transcript reveals that the trial court in fact believed that these Exhibits were admitted without objection, except one (State's Exhibit L) which the court stated was admitted over objections.

{¶38} The exhibits were marked and introduced during the multiple day trial. Witnesses testified and were cross-examined regarding many, if not all, of the State's exhibits. In such instance, the evidence is deemed admitted. *State v. Culbertson*, 2026-Ohio-333, ¶ 28 (5th Dist.), citing *In re Deters*, 2020-Ohio-3518 (1st Dist.) (Exhibits are deemed admitted when they are treated as admitted by the trial court and counsel without objection); *United States v. Barrett,* 111 F.3d 947, 951 (D.C. Cir. 1997). In its Judgment Entry, the trial court states:

> The State also moved to admit twelve (12) exhibits, those being: Exhibit A -
>
> Ohio Department of Job and Family Services Family Case Plan filed on

March 10, 2023; Exhibit B - Ohio Department of Job and Family Services Family Case Plan filed on January 18, 2024; Exhibit C - Judgment Entry and Magistrate's Decision filed on April 21, 2023; Exhibit D - Forensic Fluids Certified Drug Test Results for [Mother]; Exhibit E - Forensic Fluids Certified Drug Test Results for [Father]; Exhibit F - Delaware County Criminal Complaint, filed on November 21, 2024, in Case No. 24CRB01136; Exhibit G - Letter From Michigan Department of Licensing and Regulatory Affairs; Exhibit H – Certified Copies of Pleadings, Orders, and Judgment Entries in Fairfield County Criminal Case No. 23CR097; Exhibit I - Certified Copies of Pleadings, Orders, and Judgment Entries in Fairfield County Criminal Case No. 23CR098; Exhibit J - Decree of Dissolution of Marriage in Franklin County Case No. 16DR041439; Exhibit K - Mount Carmel Behavioral Health Records for [Mother]; and, Exhibit L - Certified Copy of Final Judgment Entry, filed on May 8, 2025, in Delaware County Municipal Court Case No. 24CRB01136. *State's Exhibits A-K were admitted without objection*. State's Exhibit L was admitted over the objections made by Attorney Gilbert and Attorney Warner.

*See Judgment Entry, November 4, 2025,* pp. 3-4 (emphasis added).

**{¶39}** Thus, the parties operated under the assumption that the subject exhibits were admitted. Moreover, the trial court is presumed to have only considered relevant, competent, and credible evidence. *Gonzalez v. Spofford*, 2005 Ohio 3415, ¶ 43 (8th Dist.), citing *State v. Post*, 32 Ohio St.3d 380, 384 (1987). A trial judge is further presumed to be capable of disregarding improper evidence or evidence not admitted. *Id.*; *State v. Eubank*, 60 Ohio St.2d 183, 187 (1979). Thus, if other evidence has been offered to prove

that which the challenged evidence was offered to prove, any error is considered harmless error. *In re S.D.S.*, 2024-Ohio-255, ¶ 36 (8th Dist.).

{¶40} Here, it is abundantly clear that the trial court's detailed decision was based on the entire record, as well as the testimony and cross examination of the many witnesses who testified at the PC hearing, including Mother's witnesses. The trial court had a plethora of evidence to support its decision separate and apart from the State's exhibits. Thus, even assuming the exhibits were not properly admitted, the trial court relied upon significant evidence with which to base its decision and any error is harmless. *In re West Techs. Indus.*, 132 Ohio App.3d 145, 153 (10th Dist.).[4] **Mother and Father's first assignment of error is overruled.**

### 2. Ineffective Assistance of Counsel

{¶41} In the second assignment of error, the Parents assert ineffective assistance of counsel and lists *multiple instances* to support said claim. Some such instances include actions by counsel at different stages of the proceedings, meaning prior to the PC hearing. This Court has recognized "ineffective assistance" claims in permanent custody appeals. *In re Utt Children*, 2003-Ohio-4576 (5th Dist.). Indeed, where the proceedings involve the permanent termination of parental rights, the test for ineffective assistance of counsel used in criminal cases is equally applicable. *In re Wingo*, 2001-Ohio-2477 (4th Dist.); In re Baby Girl O., 2023-Ohio-4323, ¶ 11 (5th Dist.). Thus, the applicable standard of review is as follows:

---

[4] Mother's claim that her Exhibit K was improperly excluded (*Appellants' Brief*, pp. 17-18) also fails. Appellants utterly fail to "demonstrate prejudicial error by the trial court that affected the outcome" of the case. *State* v. *Remillard,* 2019-ohio-3545, ¶ 70 (5th Dist.).

A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell*, 506 U.S. 364, (1993); *Strickland v. Washington*, 466 U.S. 668 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989). In order to warrant a finding that trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley*. *Knowles v. Mirzayance,* 556 U.S. 111 (2009).

In light of "the variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant," the performance inquiry necessarily turns on "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, at 689. At all points, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, at 689.

*Mansfield v. Studer,* 2012-Ohio-4840, ¶¶ 58-61 (5th Dist.).

**{¶42}** To prevail on an ineffective assistance of counsel argument, the person so claiming must establish two prongs: first, that his trial counsel's performance fell below an objective standard of reasonable representation involving a "substantial violation" of an essential duty to appellant. *Id.* This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id.*; *Strickland*, at 687. Second, appellant must demonstrate actual prejudice by such alleged ineffectiveness. In other words, there must be a reasonable

probability that *but for* counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, at 691-696.

**{¶43}** Importantly, as stated above, an appellate court's review of trial counsel's actions and decisions is highly deferential, meaning strategic or tactical decisions will not form a basis for an ineffective assistance of counsel claim. *Id.*, at 689; *State v. Clayton*, 62 Ohio St.2d 45, 48-49 (1980); *State v. Mason*, 82 Ohio St.3d 144, 157-58 (1998) (stating that an appellate court may not second guess a trial counsel's strategy decisions). By way of example, an attorney does not engage in deficient performance, and a party is not prejudiced, when an attorney does not file futile motions. *State v. Fogle,* 2026-ohio-722, ¶ 58 (5th Dist.) (A defendant will not prevail on a claim of ineffective assistance of counsel for not filing a motion "where counsel could have reasonably decided that filing such a motion would have been futile.").

**{¶44}** Although some of Appellants' arguments border on frivolous, we will address them for the sake of completeness. Mother and Father identify a litany of alleged missteps that are summarized as follows:

1.      Failure of Mother's counsel to request an evidentiary hearing to contest any findings as to whether or not JFS met their burden of proof that the agency engaged in any reasonable efforts.

2.      Counsel failed to effectively enforce the visitation orders and failed to enforce the order that JFS further investigate family counseling as set forth in a January 2024 court order.

3.      Counsel failed to file a properly drafted motion for contempt, failed to serve the State, failed to timely attempt to file an amended motion for contempt as ordered by the court, failed to follow the court's instructions on

correcting the deficiencies in the first contempt, and failed to redraft and refile the motion to get the matter properly before the court.

4. At no time after visits stopped on 9/23/2023 did Mother's counsel request a court order to amend the case plan pursuant to R.C. 2151.412(F)(2) to obtain an order that family counseling occur.

5. Counsel failed to file a motion requesting that the juvenile court appoint an expert mental health professional to evaluate the children.

6. Mother claims that Exhibit T contained video evidence of the actual collection of drug testing samples by Kelly Zigan that show she failed to follow the proper collection protocol and contaminated the samples collected. It also contained video of the supervised visitation of 9/23/2023 which prompted the children's two-year refusal to visit or otherwise communicate with their Parents. Counsel failed to provide a laptop or equipment to play this evidence at the PC hearing. Counsel failed to make further effort later in the trial to produce this evidence.

7. Counsel failed to identify a defense expert toxicologist to refute Forensic Fluids when a primary issue was the reliability of the Agency's testing.

8. Mother's counsel failed to request any discovery and Parents' counsel failed to specifically request and to follow up with a motion to compel to obtain SACWIS and Traverse records.

{¶45} First, several arguments relate to strategic and tactical decisions by counsel made at a specific moment in time and based on facts known to counsel at that specific time. For example, Parents cite to various proceedings held prior to the PC hearing and

claim that counsel did not object to the trial court's findings regarding the Agency's reasonable efforts. However, there are no transcripts of the earlier proceedings included as part of the record on appeal. What is apparent from the record are the court's numerous statements regarding *evidence* of the Agency's "diligent" and "intensive" efforts throughout. Even as late as July 2024, six (6) months after the motion for PC was filed, the court granted the Agency's continuance request to explore a belated kinship placement option. In granting the continuance, the court noted the Agency's "intensive efforts."

{¶46} Regarding motions that should have been filed, discovery that should have been had, or exhibits/evidence that should have been used, the fact is that any possible prejudice is based upon speculation. Mere "speculation is insufficient to establish ineffective assistance." *State v. Short,* 2011-Ohio-3641, ¶ 119, quoting, *State v. Perez,* 2009-Ohio-6179. These types of decisions are the very definition of strategic and/or tactical that are entitled to great deference. There is simply nothing to suggest that the above alleged failures had any effect whatsoever on the actual decision granting PC or that "but for" counsel's alleged errors along the way, the outcome would be different. As such, the Parents' arguments fail to establish any counsel's performance fell below an objective standard of reasonableness and similarly fail to identify the necessary deficient performance.

{¶47} The harsh reality of this case is that Mother, Father, and their children, have been involved with multiple agencies for multiple years in multiple Ohio counties. The instant Agency has made every attempt to develop appropriate case plans and goals for reunification. The Agency has provided resources, assisted in visitation, explored various kinship placements, collected drug samples to ensure compliance, and the list goes on

and on. Mother and Father simply cannot acknowledge their past drug issues and related behavior. By way of example, Mother was positive for cocaine with samples collected on December 28, 2023; March 7, 2024; March 8, 2024; April 5, 2024; August 12, 2024, and November 19, 2024. Yet, Mother continues to claim she does not and never did have a drug problem. And Father, who was in prison for some of the case, had a positive test for cocaine from a November 19, 2024, sample, only two months after his release.

**{¶48}** Although Mother and Father made some progress by the time of the PC hearing, neither had *completed* drug treatment as required, and their "progress" began only after the PC motion was filed. Instead, Mother (and Father) shift blame to their respective counsel throughout the proceedings to divert this Court's attention from their long-standing drug use and corresponding behavior. Thus, counsels' respective decisions along the way are entitled to great deference and this court will not second guess those decisions. **Mother and Father's second assignment of error is overruled in its entirety.**

### 3. JFS Records

**{¶49}** Mother and Father's third assignment of error states that the trial court erred and abused its discretion when it refused to order that the state provide certain Agency records, namely SACWIS and Traverse,[5] and proceeded immediately to trial in violation of their due process rights. Mother and Father requested said documents on the first day of the PC hearing. Mother and Father argue "[t]he state failed to turn over critical, relevant evidence when it failed to provide the JFS records to the parents, including SACWIS and Traverse." *Mother and Father's Brief*, p. 22.

---

[5] SACWIS stands for Statewide Automated Child Welfare Information System and Traverse is a specialized digital document management software used by child welfare programs to create a centralized, electronic case file.

**{¶50}** Although Mother and Father did not technically file a motion to compel, the standard of review is noteworthy. As with all evidentiary issues, a trial court maintains broad discretion in regulating discovery and said decisions are reviewed under an abuse of discretion standard. *State ex rel. Rhodes v. City of Chillicothe*, 2013-Ohio-1858, ¶ 17 (4th Dist.). A trial court abuses its discretion only if its decision is unreasonable, arbitrary, or unconscionable. *Id.*

**{¶51}** Here, the documents referenced are not a part of the record on appeal. Other than Mother and Father's bare assertion in their Brief that the evidence was "critical," there is absolutely no evidence that the denial of the Parents' request resulted in prejudice to Mother and Father that would have changed the outcome of the PC proceedings. The trial court clearly did not rely on said documents *when granting PC*. Mother and Father must demonstrate error and resulting prejudice by reference to matters within the record. *State v. Ginier,* 2026-Ohio-415, ¶ 9 (5th Dist.). Such burden is not met by mere speculation regarding the content of various documents. *In re H.A.*, 2020-Ohio-2945, ¶ 46; *In re J.T.*, 2009-Ohio-6224, ¶ 67 (8th Dist.). It would be entirely speculative for this court to find a different outcome on appeal. In addition, the court is mindful that the evidence in support of granting PC, as referenced throughout this Decision, *is significant*. For these reasons, **Appellant's third assignment of error is overruled.**

### 4. R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1)

**{¶52}** In the fourth assignment of error, Mother and Father argue that the trial court erred in finding that the Agency engaged in reasonable efforts to reunify the children and claim that they did remedy the conditions leading to the removal. Mother and Father argue that said finding is against the manifest weight of the evidence and that the Agency

simply stopped all contact between the Parents and children, thereby failing to make reasonable efforts. We disagree.

{¶53} In conjunction with R.C. 2151.414(B)(1)(a), that a child cannot or should not be placed with a parent within a reasonable time, R.C. 2151.414(E)(1) requires that the trial court determine whether, despite reasonable case planning and diligent efforts by the agency, the parent failed to substantially remedy the conditions that caused the children's removal. That section reads, in part:

> (E)(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the Parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
>
> * * *

{¶54} Under R.C. 2151.414(E)(l), "the court must examine the reasonable case planning and diligent efforts by the agency to assist the Parents when considering whether the child cannot and should not be placed with the parent within a reasonable time." *In re M.K.,* 2023-Ohio-96, ¶ 49 (5th Dist.). Reasonable efforts mean that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " *In re H.M.K.,* 2013-Ohio-4317, ¶ 95 (3rd Dist.), quoting *In re D.A.,* 2012-Ohio-1104, ¶ 30 (6th Dist.); *see also In Re D.D.,* 2023-Ohio-4147, ¶ 23 (10th Dist.).

{¶55} Here, sufficient evidence exists to support the finding that the Agency complied with its duty. As set forth above, in 2023, the Agency established a case plan

with multiple significant objectives to remedy the conditions that led to the children's removal. The Agency provided the Parents with a copy of the case plan as well as multiple recommendations for area service providers who could offer the requisite assessments and treatment, including mental health for Mother. The Agency offered random drug and alcohol screens to Mother and Father, attempted and completed home visits, facilitated visitation, and fully explored kinship and relative placements. The Agency consistently monitored Mother and Father's progress on case plan services. The record reflects that, on several separate prior occasions, the trial court found that the Agency made reasonable efforts to reunify Mother and Father with the children. *See In re N.K,* 2026-Ohio-1087, ¶ 65 (5th Dist.).

**{¶56}** One of the many stated objectives, and perhaps the most important one, regarded Mother and Father's substance abuse that resulted in significant parenting and safety issues. Caseworker Tracy testified that one of the Agency's primary ongoing concerns is that neither parent has any type of relapse prevention plan, which he testified is standard for individuals engaging in substance abuse treatment. This is particularly concerning given that the Parents continue to deny any drug use, despite producing positive screens throughout the cases. Further, as of April 2025 - fifteen months after the motion for permanent custody was filed - neither Mother nor Father had successfully completed drug treatment. Rather than address the Agency's legitimate substance abuse concerns, the Parents denied the results of Agency drug screens and claimed that most, if not all, of the positive drug screens were false-positives or were tampered with in some way.

**{¶57}** The evidence demonstrates that neither parent has demonstrated an understanding of the dangerous situations involving their children prior to their removal

and they simply have not implemented sufficient meaningful changes. Indeed, despite criminal charges and incarceration for her actions, Mother testified that she still does not understand why the children were removed. The Parents' utter failure to take some responsibility in the children being removed is quite frankly, astonishing. As stated above, we must neither weigh the evidence nor judge the credibility of the witnesses. An appellate court's role is simply to ensure that sufficient evidence exists to support the trial court's findings.

{¶58} The Parents' claim that they had substantially completed the case plan is similarly insufficient. First, much of the Parents' efforts occurred after the PC motion was filed, well after the children were removed in 2023. "Belated and sporadic attempts to cooperate with a case plan are insufficient compliance to warrant reunification."' *N.K,* ¶ 64, *quoting, In re Wilson,* 1999 WL 125749 * 4 (8th Dist.). Although the Parents made some progress after the PC motion was filed, the trial court was permitted to view that progress in conjunction with the entire history of the matter. *N.K.,* ¶ 69. Second, as set forth above, neither Mother nor Father acknowledges their respective drug use or past abuse or that they placed their children in danger. The record reveals that neither parent accepts any responsibility for the children being removed in the first place.

{¶59} Third, the Agency's decision to stop visitation does not mean they did not initially utilize reasonable efforts to reunify. To the contrary, the record supports that the Agency reduced visitation based on the children's emotional response to the visits. *Id.,* at ¶ 66 ("The record clearly demonstrates that the modification of visitation was tied to N.K.'s emotional response, not to any abandonment of reunification efforts by the Agency."). Based on the totality of the evidence, we conclude that competent, credible

evidence exists to support the trial court's finding under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1).

***R.C. 2151.414(E)(4) and (E)(16)***

**{¶60}** In addition to subsection (E)(1) above, the trial court specifically concluded that clear and convincing evidence existed under R.C. 2151.414(E)(4) and (E)(16). A finding under (E)(4) requires that the court find the children cannot be placed with Mother or Father because they have demonstrated a "lack of commitment" towards the children by failing to regularly support, visit, or communicate with the children when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the children.

**{¶61}** Subsection (E)(16) allows a court to consider "[a]ny other factor the court considers relevant." Importantly, this factor does not have any requirement that a parent "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home" like (E)(1), nor the "lack of commitment" or "unwillingness" elements found in (E)(4). Regarding (E)(16), the trial court stated:

> Pursuant to R.C. 2151.414(E)(16), the Court finds it extremely relevant that the Parents continue to deny their use of illicit substances, including [Mother's] testimony that she has never used an illicit substance, despite the evidence that they have a history of substance abuse issues, the incident that caused the children's removal, and the positive drug screens collected throughout these cases. Starting with the drug screen collected on the date of the Agency's initial involvement, both Parents have tested positive for multiple illicit substances on a number of Agency drug screens. Both Parents have engaged in drug treatment programs throughout these

matters, but have not successfully completed any programming to the Agency's knowledge. Both Parents contend that their participation in drug treatment and counseling is not because they have issues with drug addiction, but because it was a requirement of their probation. Additionally, both Parents have tested positive for suboxone, a prescription for the treatment of withdrawal symptoms, throughout these matters, but [Mother] has been unable to provide a prescription for the medication, and she contends that she takes it for neck pain.

**{¶62}** Aside from the drug use and the Parents' failure to acknowledge, the Agency had concerns regarding the lack of income verification, Mother's mental health issues, and her lack of awareness regarding same. Indeed, Mother was subject to involuntary emergency hospitalization in December of 2024, when she informed the physician that she was having suicidal ideations and experiencing multiple personalities. Mother denied stating this despite physician notes. The GAL agreed with the Agency's concerns.

**{¶63}** Notwithstanding the above concerns, the Parents <u>do not even challenge</u> the trial court's findings under either (E)(4) or (E)(16). As a result, the Parents forfeit any argument on appeal that the trial court erred in its findings under these subsections. The Parents' failure "to second-guess the trial court's view that sufficient evidence was presented on those two factors is fatal to his appeal, given that any single factor can support a finding that a child cannot be placed with a parent within a reasonable time." *In re A.S.*, 2025-Ohio-2663, ¶ 26 (5th Dist.); *See Matter of L.T.*, 2024-Ohio-2700, ¶ 13 (5th Dist.). Even assuming Mother and Father did challenge said findings, significant evidence exists in the record to support both. **Mother and Father's fourth assignment of error is overruled**.

### 5. Best Interest under R.C. 2151.414(D)(1)

{¶64} The fifth assignment of error alleges that the trial court erred in determining that PC was in the children's best interest We disagree. As set forth above, in determining best interest, the trial court must consider each factor enumerated in R.C. 2151.414(D), as well as any other relevant factors, and no one factor is given greater weight than the others. *In re Schafer,* 2006-Ohio-5513. Importantly, the focus of the "best interest" determination is upon the child, not the parent. Indeed, R.C. 2151.414(C) expressly prohibits the court from considering the effect a grant of permanent custody would have upon the Parents. *A.W., supra.*

{¶65} "A child's best interests are served when the child is placed in a permanent situation which fosters growth, stability, and security. * * * 'The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *MK,* ¶ 36, citing *In re E.H,* 2022-Ohio-1682, 101 (5th Dist.). Thus, if competent, credible evidence exists to support the trial court's best interest finding, it will be upheld.

{¶66} Regarding the first two factors, the testimony demonstrates that the children are very bonded to their foster family and have repeatedly requested to stay there. The children have similarly requested not to see Mother and Father and do not want to be reunited; they expressed fear that Mother and Father would find them and take them. The children are old enough to express these wishes. The third factor - custodial history of the child - also supports the trial court's determination. The children have been with the same foster parents since February 2023, nearly three (3) years by the

time the Judgment Entry granting PC was filed. The evidence clearly demonstrates that the children are bonded to the foster family and are thriving in the home.

{¶67} Regarding the fourth factor, the children need stability, in fact crave said stability, and have achieved stability with the foster family. The fifth and final factor is inapplicable. Based on the evidence and record before the Court, we conclude that competent, credible evidence supports the trial court's determination that PC is in the children's best interest. Accordingly, **Mother and Father's fifth assignment of error is overruled**.

## CONCLUSION

{¶68} After reviewing the entire record, we conclude that the trial court properly granted PC to the Agency. Appellant's first, second, third, fourth, and fifth assignments of error are overruled in their entirety. The judgment of the Licking County Court of Common Pleas, Juvenile Division, is AFFIRMED.

{¶69} Costs to Appellant.

By: Montgomery, J.

King, P.J. and

Baldwin, J. concur.